UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
RAYMOND FARZAN,                                :

               Plaintiff,                    :

     - against-                             :

WELLS FARGO BANK, N.A., et al.,       :

             Defendants.             :
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/2/13

12 Civ. 1217 (RJS) (JLC)

REPORT AND
RECOMMENDATION

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable Richard J. Sullivan, United States District Judge:**

Plaintiff Raymond Farzan, proceeding pro se, has filed suit against Defendants Wells

Fargo Bank, N.A. ("Wells Fargo"),[1] Wells Fargo manager Brenda Altenburg,[2] and Genesis10

("Gen10") under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination

in Employment Act of 1967 ("ADEA"), the New York State Human Rights Law ("NYSHRL"),

and the New York City Human Rights Law ("NYCHRL"). Farzan also brings a claim for

defamation against Altenburg for remarks included in a submission made by Wells Fargo to the

Equal Employment Opportunity Commission ("EEOC"). Farzan, an Iranian-American Muslim

in his sixties, alleges that Defendants discriminated against him on the basis of his race, national

origin, religion, gender, and age by: (1) refusing to recognize that he was an employee of Wells

---

[1]     Wells Fargo was incorrectly identified in the amended complaint as "Wells Fargo Bank."
(See Wells Fargo Answer to Am. Compl., dated August 15, 2012 (Dkt. No. 29), at Introduction).
The caption was amended with the bank's correct name in the Memorandum and Order issued by
Judge Sullivan in Farzan v. Wells Fargo Bank, N.A., No. 12 Civ. 1217 (RJS) (JLC), 2013 WL
2641643 (S.D.N.Y. June 11, 2013).

[2]     Where the Court discusses defenses, claims, arguments, etc. as they pertain to both the
corporate Wells Fargo entity and its employee Altenburg, it refers to the two collectively as "the
Wells Fargo defendants" or, where the meaning is clear, simply as "Wells Fargo."

Fargo; (2) denying him a permanent employment position; (3) refusing to extend his temporary

work assignment; (4) retaliating against him after he complained; and, (5) terminating him. Both

the Wells Fargo Defendants and Gen10 now move for summary judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that their

motions be granted.

## I.      BACKGROUND

### A.  Facts[3]

#### 1.  Farzan's Assignment to Wells Fargo and Employment Through Gen10

Farzan worked at Wells Fargo from January 2010 until his termination in November

2011. (Farzan Stmt. ¶¶ 1, 151). His application to work at Wells Fargo was initially processed

---

[3]      The facts presented here are taken from the parties' pleadings and submissions related to
the pending motions. Farzan's submissions include his amended complaint ("Am. Compl.," Dkt.
No. 18) and opposition papers to the motions for summary judgment ("Opp. Papers," Dkt. No
82), which consist of the following: his affidavit ("Farzan Aff."); responses/counterstatements to
both Wells Fargo and Genesis10's Local Rule 56.1 statements of material facts ("Farzan Resp. to
Wells Fargo Stmt." and "Farzan Resp. to Gen10 Stmt.," respectively), as well his own statement
of additional facts ("Farzan Stmt."); a memorandum of law in opposition to the motion entitled
"Plaintiff's Legal Points" ("Farzan Mem."); unsworn documents in which Farzan disputes
statements made in affidavits submitted as part of Defendants' motion papers; and various
documents obtained by Farzan during the course of the litigation.

As part of their submissions, the Wells Fargo defendants filed responses to Farzan's Rule
56.1 statement of additional facts (Dkt. No. 88), but Gen10 did not. Local Rule 56.1 does not
specifically require responses by a moving party to additional material facts submitted by an
opposing party. See Local Rule 56.1(c). However, the Court takes into account Wells Fargo's
responses to Farzan's additional facts (many of which serve to respond to factual allegations
involving Gen10 as well) as part of its independent review that the various Rule 56.1 statements
and counterstatements are adequately supported in the record. See, e.g., Holtz v. Rockefeller &
Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001).

Where facts are undisputed, the Court cites only to one of the parties' Rule 56.1
statements, meaning that the cited paragraph is admitted in the corresponding paragraph of the
other party's response. Where facts are disputed, the Court cites to specific Rule 56.1 statements
or responses and to the parts of the record supporting the parties' respective contentions. If the
disputed facts are material, the Court construes them in the light most favorable to Farzan, the
non-moving party, as part of its legal analysis below.

by an outside staffing agency, Marlabs, Inc. ("Marlabs"), after Farzan responded to an online

advertisement posted by Marlabs for a technical business analyst position at an unspecified

major bank in late 2009. (Gen10's Local Rule 56.1 Statement ("Gen 10 Stmt.") (Dkt. No. 79), ¶

8). Marlabs arranged for Farzan to be interviewed for a position in Wells Fargo's New York

office by upper level Wells Fargo personnel, including Judy Chan ("Chan"), a business systems

consultant manager, and Steve Goldin ("Goldin"), Chan's supervisor. (Farzan Stmt. ¶ 1; Wells

Fargo's Local Rule 56.1 Statement ("Wells Fargo Stmt.") (Dkt. No. 74), ¶¶ 9-13). At the end of

their interview, Goldin offered Farzan a position at Wells Fargo, which Farzan accepted

immediately. (Farzan Stmt. ¶ 7). Goldin explained to Farzan, however, that he could only be

hired through another outside firm, Gen10, Wells Fargo's "preferred vendor" for the position in

question. (Wells Fargo Stmt. ¶¶ 14-15; Deposition Transcript of Raymond Farzan, dated Oct. 2,

2012 and Dec. 27, 2012 ("Farzan Tr."), attached as Ex. B to Affirmation of Michelle E. Phillips

in Support of Wells Fargo's Motion for Summary Judgment ("Phillips Aff.") (Dkt. No. 70) and

attached as Ex. E to Declaration of Clare M. Sproule in Support of Gen 10's Motion for

Summary Judgment ("Sproule Decl.") (Dkt. No. 77): 62:11-64:24).

Gen10 is a business and technology staffing firm that, in the period relevant to Farzan's

claims, contracted with Wells Fargo to provide temporary workers to maintain Wells Fargo's

internal financial services computer systems. (Wells Fargo Stmt. ¶¶ 2-3; Phillips Aff., Ex. A:

Gen10/Wells Fargo Master Agreement).[4] In January 2010, Farzan and Gen10 signed an

---

[4]     Farzan questions whether the staffing agreement between Wells Fargo and Gen10 was
actually in place at the time of his hire, as the Master Agreement between Wells Fargo and
Gen10 cited to in the record is dated from 2011. (Farzan Resp. to Wells Fargo Stmt. ¶ 4). The
agreement does incorporate by reference a prior, purportedly similar 2006 agreement (a copy of
which is not in the record). (Phillips Aff., Ex. A). In any event, the existence of a written
agreement covering the companies' relationship in January 2010 is irrelevant; it is clear from the

employment agreement.[5]  (Wells Fargo Stmt. ¶ 16; Phillips Aff., Ex. C: Gen10/Farzan

Employment Agreement).  The agreement provided for an initial one-year term with Gen10 with

automatic renewal, and for Gen10's ability to terminate Farzan's employment at any time for

"cause, performance reasons or professional misconduct."  (Wells Fargo Stmt. ¶¶ 17, 19; Phillips

Aff., Ex. C: Gen10/Farzan Employment Agreement ¶ 4).

  Upon commencing work at Wells Fargo in January 2010, Farzan received training in

internal Wells Fargo systems, including a computerized system for managing commercial loans.

(Farzan Stmt. ¶¶ 36, 56).  His duties during his tenure at Wells Fargo included: using Wells

Fargo systems to prepare loan documents; conducting research; and providing follow up support

to staff members.  (Id. at ¶ 60).  Farzan was supervised directly by Wells Fargo manager Chan,

who assigned him projects and set and approved his forty-hour workweek schedule.  (Id. at ¶¶

40, 50, 59).  Wells Fargo also provided Farzan with a work station, a personal computer, internal

network access, email, stationery, and a number for conducting conference calls.  (Id. at ¶¶ 39,

44).  Farzan had a desk that was located among those of permanent Wells Fargo employees (id.

at ¶ 67), used the same access cards as permanent Wells Fargo employees (id. at ¶ 66), and

attended the same weekly team meetings (id. at ¶ 63).

  In contrast to permanent Wells Fargo employees, Farzan received his compensation from

Gen10, which issued biweekly paychecks based on hours that Farzan logged into a Wells Fargo

---

facts presented, discussed in detail below, that Farzan's employment was governed by a staffing
arrangement between Wells Fargo and Gen10.

[5] Farzan asserts that Gen10 was "not involved at all" in the hiring process because he had
already been hired by Wells Fargo (presumably referring to his acceptance of Goldin's offer).
(Farzan Stmt. ¶ 12).  But he does not deny that he executed an employment agreement and states
that "signing that agreement was part of the administrative process" and that he "was told to go
through Genesis10 to get paid." (Farzan Resp. to Wells Fargo Stmt. ¶¶ 16, 15).  Indeed, both
Farzan and Gen10 filed a copy of the same agreement. (Am. Compl. Ex. C).  Although these
copies are of an unexecuted version, Farzan and Gen10 concur that the agreement in question
was signed by both parties.  (Wells Fargo Stmt. ¶ 16; Farzan Resp. to Wells Fargo Stmt. ¶ 16).

time record-keeping system and that Chan approved.  (Id. at ¶¶ 48-49, 51).  Gen10 issued Farzan

an annual W2 tax form.  (Gen10 Stmt. ¶ 6; Farzan Tr.: 26:21-23).  In addition, it was Gen10 that

provided Farzan's employee benefits, including health and dental coverage (which Farzan

declined), as well as term life insurance.  (Farzan Stmt. ¶¶ 52-53).  However, after the process of

preparing his initial paperwork in January 2010 until the events leading to his termination in late

2011, Farzan's contact with Gen10 and its staff was infrequent and limited only to occasional

email communications about payroll and benefits issues.  (Gen10 Stmt. ¶ 17; Farzan Tr.: 122:7-

130:24).

### 2.  Wells Fargo's Contingent Worker Policy

Wells Fargo classified Farzan as a "contingent worker," a category of external, temporary

personnel distinct from permanent, or "direct," Wells Fargo employees.  (Wells Fargo Stmt. ¶¶ 3,

8).  Wells Fargo maintains that, according to its policy, contingent workers were limited to 18-

month appointments after which they were barred from providing any additional services to

Wells Fargo for at least six months.  (Wells Fargo Stmt. ¶ 5; Affidavit of Brenda Altenburg in

Support of Wells Fargo's Motion for Summary Judgment ("Altenburg Aff .") (Dkt. No. 71), Ex.

A: Length of Contingent Worker Assignment Policy).  Extensions beyond 18 months could be

granted with supervisor approval should there be a justifiable business need.  (Wells Fargo Stmt.

¶ 6; Altenburg Aff. ¶ 9; Altenburg Aff., Ex A).  Contingent workers could also apply for

"conversion" into permanent employee status as direct positions became available but, according

to Wells Fargo, such applications were not given any particular priority and were considered

along with those from other "external" applicants.[6]  Farzan asserts that at the time of hire he was

---

[6]      According to Wells Fargo, any job opportunity is first advertised on an internal jobs site
and direct employees are encouraged to apply. (Wells Fargo Stmt. ¶ 29; Altenburg Affidavit in
Support of Wells Fargo's Motion for Summary Judgment ("Altenburg Aff."), ¶ 21).  If the

never informed of his status as a contingent worker or of any predetermined time limitation to be imposed on him at Wells Fargo. (Farzan Stmt. ¶¶ 29, 31; Farzan Tr: 113: 22-25).

At least 13 contingent workers in addition to Farzan were assigned to Wells Fargo during his time at the bank.[7] At least two of these temporary staffers were also technical analysts assigned to the same team as Farzan: Aliasgar Kothari ("Kothari") and Sabu Abraham ("Abraham"), both of whom were men in their thirties and not of Iranian origin (Kothari is identified as having been born in India). (Farzan Stmt. ¶¶ 193, 204; Deposition Transcript of Aliasgar Kothari, dated December 28, 2012 ("Kothari Tr."), attached to Farzan's Opp. Papers: 11-14; Deposition Transcript of Sabu Abraham, dated December 26, 2012 ("Abraham Tr."), attached to Farzan's Opp. Papers: 4: 3-4, 14-15). Both Kothari and Abraham took over some projects from Farzan in October 2011. (Farzan Stmt. ¶¶ 205-06).

Although the assignment lengths of the contingent workers varied, for the most part they remained under 18 months, consistent with Wells Fargo's policy. (Wells Fargo Stmt. ¶¶ 45-53;

---

position remains unfilled after this initial stage, external applications, including from contingent workers, are then considered. (Wells Fargo Stmt. ¶¶ 32-33; Altenburg Aff., ¶¶ 24-25). However, Wells Fargo's Internal Job Opportunities and External Recruitment policies appear to indicate that the approach was more flexible: "[External recruitment] is typically done after *or at the same time* as an internal search." (Altenburg Aff., Ex. H) (emphasis added).

[7]      Although the parties dispute certain details concerning precise lengths of assignments, their submissions taken together identify the following contingent workers: Marian Wallace, James O'Brien, Sabu Abraham, Aswin Singiri, Praveen Palem, John Lombardi, Arun Dahkal, Mikhail Vinogradov, David Judd, Sandeep Singhal, Mona Aggarwal, Aliasgar Kothari, and Arun Dahkal. (Wells Fargo Stmt. ¶¶ 45-53; Farzan Stmt. ¶¶ 180, 190, 193, 197).

Farzan contends that Judd, Singhal, Aggarwal, and Dahkal, were all "non-Iranian" and that they were younger than he was, their ages ranging from the mid-thirties to mid-forties. (Farzan Stmt. ¶¶ 180, 190, 197, 202). However, he does not point to any part of the evidentiary record to support these assertions. An independent review of the record reveals that Altenburg's sworn affidavit described Singhal as an Indian male, who was 50 years old. (Altenburg Aff. ¶ 27). But it only characterizes Aggarwal as an "Indian female" and Dahkal as an "Indian male." (Id. at ¶¶ 28-29). There is no basis in the record to establish any facts concerning Judd's characteristics.

Altenburg Aff. ¶¶ 11-19, 27-28; Altenburg Aff., Ex. D: Wells Fargo Contractor List).  However, aside from Farzan, who received his own extension as discussed below, three others had assignments extending beyond 18 months: Abraham, who stayed for 20 months (Altenburg Aff., Ex. D); David Judd ("Judd"), whose term lasted 30 months (Farzan Stmt. ¶ 101); and Paveen Palem ("Palem"), who completed one stint of 30 months and a subsequent term of 26 months (Farzan Stmt. ¶ 100; Wells Fargo Rep. Mem. at 10).  In addition, four workers who were originally on contingent status were ultimately hired into permanent, direct employee positions at Wells Fargo: Kothari, Sandeep Singhal ("Singhal"), Mona Aggarwal ("Aggarwal"), and Arun Dahkal ("Dahkal"). (Farzan Stmt. ¶¶ 183, 192, 196, 199).

### 3.  Farzan's Interest in Conversion to a Permanent Wells Fargo Position

#### a.  The June 2010 Position

In June 2010, Altenburg, who had replaced Goldin as technology manager and Chan's supervisor, visited New York to meet with Chan's team.  (Farzan Stmt. ¶¶ 77-78).  During the visit, Altenburg and Farzan spoke privately and discussed the possibility of Farzan joining Wells Fargo as a direct employee.  (Wells Fargo Stmt. ¶ 25).  The parties agree that Altenburg expressed satisfaction in Farzan's performance (Farzan Stmt. ¶ 79; Deposition Transcript of Brenda Altenburg, dated December 5, 2012 ("Altenburg Tr."), attached to Farzan's Opp. Papers: 26: 21-23), but they dispute the content and outcome of the meeting.  In Farzan's version, the conversation amounted to a job interview and led to a concrete offer by Altenburg to "convert" Farzan to a permanent Wells Fargo position at a salary to be negotiated close to Farzan's pay at the time.  (Farzan Stmt. ¶ 79; Farzan Aff. ¶ 45).  Farzan specifies that Altenburg referred him to an online listing of job opportunities specifically posted for internal Wells Fargo employees. (Id.).  Wells Fargo and Altenburg maintain that Altenburg simply referred Farzan to the online

job descriptions and encouraged him to review the applicable salaries and apply as positions became available.  (Wells Fargo Resp. to Farzan Stmt. (Dkt. No. 88) ¶ 79; Wells Fargo Stmt. ¶ 27; Altenburg Tr.: 27:12-28:14).

Two days after the meeting, Farzan sent Altenburg an email stating that he had found a "technology relationship manager" position within the Wells Fargo job descriptions with a starting salary close to what he desired and requested that Altenburg "[p]lease advise."  (Wells Fargo Stmt. ¶ 28; Phillips Aff., Ex. F: June 17, 2010 Farzan Email to Altenburg).  Although Farzan stated in his deposition that he "applied for" the position, he later acknowledged that by "applying," he was referring solely to the email expressing interest to Altenburg and that he took no further steps, such as submitting an online application.  (Wells Fargo Stmt. ¶ 34; Farzan Tr.: 83:5, 291:6-14).

### b.  The November 2010 Position

The next mention in the record of Farzan's attempt to become a permanent Wells Fargo employee occurred in October 2010.  In an email exchange with Farzan discussing his interest in a direct position, as well as a possible pay raise and a six-month extension of his contingent worker assignment, Michelle Fowler ("Fowler"), a Gen10 executive, wrote that Altenburg was interested in speaking to him "about a perm job."  (Wells Fargo Resp. to Farzan Stmt. ¶ 84; October 25, 2010 Fowler Email to Farzan, attached to Farzan's Opp. Papers, "Exhibits Marked in Defendants' Depositions" ("Ex."), Pl-10).  Fowler explained to Farzan that he should speak with Altenburg about permanent opportunities and potential salary, but reiterated that "there is no guarantee that a perm position will be offered."  (Id.).

In November 2010, Altenburg telephoned Farzan to inform him about an open Wells Fargo position as a business system consultant, which had a salary of about 85 percent of

8

Farzan's pay. (Wells Fargo Stmt. ¶¶ 35-36, Farzan Stmt. ¶ 86; Altenburg Tr.: 33:3-8). Again, the
parties have competing views of the conversation and the events that followed. Farzan contends
that Altenburg offered him the position as part of her prior commitment to convert him (Farzan
Stmt. ¶ 86; Farzan Aff. ¶ 49), whereas Wells Fargo and Altenburg insist that Altenburg again
only advised Farzan about the opportunity to apply (Wells Fargo Resp. to Farzan Stmt. ¶ 86;
Altenburg Tr.: 32:24-33:8). In any event, Farzan did not take the position, later recounting in a
September 2011 email to Altenburg that he "couldn't accept the offer because the compensation
was below [ ] what I was making at the time." (Wells Fargo Resp. to Farzan Stmt. ¶ 86; Phillips
Aff., Ex. G: September 23, 2011 Farzan Email to Altenburg). The position was ultimately filled
by Christine McDonald, a Caucasian woman in her fifties. (Wells Fargo Stmt. ¶ 38; Deposition
Transcript of Christine McDonald, dated November 27, 2012 ("C. McDonald Tr."), attached to
Farzan's Opp. Papers: 5:16-17. 6:4-5).

Farzan asserts that after Christine McDonald's hiring, Altenburg assured him that he
would be converted to permanent employee status in July 2011 and that a senior position would
be created for him. (Farzan Stmt. ¶ 87; Farzan Aff. ¶ 50). Wells Fargo and Altenburg counter
that no such promise was made and that Altenburg simply recommended that Farzan "check
back" with her at a later time to see if there were available positions. (Wells Fargo Resp. to
Farzan Stmt. ¶ 87; Altenburg Tr.: 33:12-18).

### c. September 2011 Communications

Farzan and Altenburg again communicated about Farzan's interest in a permanent
position with Wells Fargo in September 2011, when he reminded her by email of her purported
November 2010 assurances of a permanent position. (Wells Fargo Stmt. ¶ 54; Phillips Aff., Ex.
G: September 23, 2011 Farzan Email to Altenburg). Altenburg responded by stating that she had

9

"not offered [Farzan] the position" and that she had "never guaranteed that [she] would have

additional open positions." (Phillips Aff., Ex. G). She continued to say that she did not have any

open positions at the time and that she "[could] not guarantee that [she] will have them in the

future." (Id.). She also summarized Wells Fargo's hiring rules, see supra n. 7, requiring jobs to

be posted internally for existing direct employees first before "external team members" such as

contingent workers could be considered, stating "I am not allow [sic] to just make offers."

(Phillips Aff., Ex. G).

Several days following these emails, Altenburg was in New York and met in person with

Farzan, who contends that during this in-person conversation Altenburg promised to work with

him towards converting him into a permanent employee. (Farzan Stmt. ¶ 92; Farzan Aff. ¶ 54).

Altenburg denies that she made such a promise, maintaining that during the meeting they

discussed only the impending end date of Farzan's contingent worker assignment and that Farzan

asked her to look into a possible extension. (Wells Fargo Resp. to Farzan Stmt. ¶ 92; Altenburg

Tr.: 40:20-41:7).

**4.  Conflict over Farzan's Status and the Extension of His Assignment End Date**

**a.  Farzan's Communication to Chan that He Would File a Complaint**

Wells Fargo had initially set an internal end date for Farzan's assignment at February 28,

2011, although it is unclear how and when this date was determined. (Wells Fargo Stmt. ¶ 40;

Phillips Aff., Ex. I: February 18, 2011 Laurel Cobb Email to Farzan). In March 2011, Wells

Fargo had granted Farzan an exception to its typical 18-month cap for contingent workers,

extending his term through December 31, 2011, by which date Farzan would have been at Wells

Fargo for 23 months. (Wells Fargo Stmt. ¶ 41; Phillips Aff., Ex. J: March 23, 2011 Chan Email

10

to Farzan).  In his deposition, Farzan contended that prior to September 2011, he had been

unaware of any policy limiting the length of his assignment.  (Frazan Tr.: 72:23-73:3).[8]

According to Farzan, early in September 2011, Chan explained to him that December 31,

2011 would be his final day per Wells Fargo policy because he had not been converted to direct

employment with the bank.  (Farzan Stmt. ¶ 89; Farzan Aff. ¶ 52).  In Farzan's version of events,

he responded by informing Chan that he would take legal action by filing a discrimination

complaint if he was not converted and his assignment was in fact terminated at the end of 2011.

(Farzan Stmt. ¶ 89; Farzan Aff. ¶ 52).  In response, Farzan alleges, Chan informed him that she

would relay the message to Altenburg.  (Id.).  A few days later, Chan told him that she had

discussed his intention to take legal action with Altenburg and that they would find a suitable

direct position for him.  (Farzan Stmt. ¶ 90; Farzan Aff. ¶ 53).  Wells Fargo denies that Farzan

ever made any threat of making a complaint during the conversation with Chan. (Wells Fargo

Resp. to Farzan Stmt. ¶ 89; Deposition Transcript of Judy Chan, dated December 12, 2012,

attached to Pl.'s Opp. Papers: 32:14-19).

### b.  Farzan's Claim to Wells Fargo and Gen10 Management that He Was a Wells Fargo Employee

On October 20, 2011, Altenburg emailed Chan's team to announce that three new

contingent workers would be appointed.  (Wells Fargo Stmt. ¶ 65; Phillips Aff., Ex. M: October

20, 2011 Altenburg Email).  Four days later, Farzan responded to Altenburg's email by noting

---

[8]     Farzan's contention that he was unaware of Wells Fargo's end date for his assignment for
much of his tenure at Wells Fargo is seemingly at odds with the fact that, by his own
acknowledgment, as early as June 2010, he was pursuing a conversion to permanent status at
Wells Fargo.  Indeed, Farzan testified elsewhere during his deposition that in March 2011, he
had communicated with a Gen10 employee, Michelle Fowler, about getting an extension to his
assignment through the end of December 2011. (Gen10 Stmt. ¶ 21; Farzan Tr.: 129:3-23).
Moreover, the email from Chan to Farzan sent to confirm the extension of his assignment in
March 2011 clearly identified him as a "contingent worker" and specified: "Assignment End
Date: 12/31/2011 (last scheduled day of work)." (See Phillips Aff., Ex. J).

11

that the news meant that there was "enough work and money for all of us [technology analysts] for a long time." (Phillips Aff., Ex. M: October 24, 2011 Farzan Email to Altenburg 1). Altenburg replied by saying that although "[t]here will be work," she "was not able to request [an] extension for [Farzan] unfortunately" and that he would be eligible to return in six months. (Id.: October 24, 2011 Altenburg Email to Farzan 1). Farzan then responded by asking why Altenburg had not been able to request an extension, adding: "Currently Wells Fargo has many open positions, why can't I convert or transfer within Wells Fargo bank?" (Id.: October 24, 2011 Farzan Email to Altenburg 2). Altenburg then reiterated Wells Fargo's 18-month policy for contingent workers and referred Farzan to her supervisor, Maureen Davoren ("Davoren"). (Id.: October 24, 2011 Altenburg Email to Farzan 2).

Farzan subsequently sent Davoren an email on the same day, October 24, stating the following:

> Brenda has been telling me that my last day at WC [sic] is 12/31/2011. That's very unfortunate and it is wrong. I have done my research: according to Federal laws and NYT [sic] State laws I am a Wells Fargo Bank employee. Several Technical Analysts (TA) have been hired after me and the[y] are still here and three new TAs are joining our team in November. Evidently there are [sic] enough work and money and my employment termination is an exception and it is unjustified. I am a Wells Fargo employee and Wells Fargo 18 months policy does not apply to me.

(Id.: October 24, 2011 Farzan Email to Davoren 1). Davoren sent Farzan a short response the next day, stating that he was employed through Gen10. (Id.: October 24, 2011 Davoren Email to Farzan). Farzan in turn wrote back to Davoren that "Wells Fargo bank pays me through Genisis10 [sic]. Many factors determine employer-employee relationship. Means of payment is only one of them." (Id.: October 24, 2011 Farzan Email to Davoren 2).

Farzan's assertion to Davoren that he was a Wells Fargo employee set off a series of communications between Wells Fargo and Gen10 personnel. Altenburg forwarded Farzan's

12

email to Janice Philippi, an account coordinator at Gen10, to ask Philippi to confirm that Farzan

was in fact a Gen10, and not a Wells Fargo, employee. (Wells Fargo Stmt. ¶ 80; Phillips Aff.,

Ex. N: October 24, 2011 Altenburg Email to Philippi). Philippi responded with an assurance that

Farzan was a Gen10 employee. (Wells Fargo Stmt. ¶ 81; Phillips Aff., Ex. N: October 24, 2011

Philippi Email to Altenburg). Davoren was also involved in the back and forth of emails,

directly asking Philippi, "How quickly are you going to address this?" (Farzan's Opp. Papers,

Ex. Pl-22: October 26, 2011 Davoren Email to Philippi). Tracy McDonald ("McDonald"), a vice

president of human resources at Gen10, then emailed Davoren, apologizing for "any

inconvenience" and indicating that McDonald would speak with Farzan about the matter. (Wells

Fargo Stmt. ¶ 83; Phillips Aff., Ex. O: October 26, 2011 Philippi Email to Davoren).

McDonald and Farzan eventually spoke by phone on October 31, 2011. (Wells Fargo

Stmt. ¶ 87). During the call, which Farzan tape-recorded and a transcript of which is included in

the record, Farzan once again explained his belief that he was employed by Wells Fargo, as well

as Gen10:

> I am managed by Wells Fargo employees. My time, my location, my work
> process, is managed by them. And they provide all the equipment and tools that I
> need to do my job. And they pay me through Genesis10. And I think that just
> makes me believe that Wells Fargo is my employer…[Gen10] could be a joint
> employer or…work[] as an agent for Wells Fargo.

(Transcript of McDonald/Farzan Conversation, dated October 31, 2011, attached to Farzan's

Opp. Papers as Ex. P-28: 3:8-16). McDonald told Farzan that while he "certainly ha[d] the

option to apply for openings that [Wells Fargo may] have," (id. at 4:5-6), Wells Fargo was "very

sensitive to" his email asserting that he was a Wells Fargo employee and was "in a very

uncomfortable position as far as legalities and how they handle consultants" (id. at 4:7-10). She

explained that Gen10 was a "huge provider" for Wells Fargo (id. at 6:18), that Wells Fargo was

"fairly upset" about the email exchange (id. at 4:24), and that Wells Fargo was expecting reassurance from Gen10 that Farzan understood that he was a Gen10, and not a Wells Fargo, employee (id. at 4:24-5:3).

Addressing Farzan's contention that Wells Fargo controls his employment, McDonald explained that Farzan has "a contract with Gen10 to work at the Wells Fargo site" and explained that only Wells Fargo could determine if he could stay past the 18-month contract. (Id. at 7:18-22). When Farzan asked about his future with Gen10 after the purported December 31, 2011 end date to his Wells Fargo assignment, McDonald expressed hope that Gen10 would be able to find another assignment for Farzan. (Id. at 7:7-15). Nonetheless, at the end of their conversation, McDonald reiterated the importance that Farzan acknowledge Gen10 as his only employer, suggesting potential consequences if he failed to do so: "I want to make it perfectly clear that I need you to understand that you work for Genesis 10 . . . And if there's any confusion about that, then we need to make a decision about you continuing at Wells Fargo because I can't have any confusion around that." (Id. at 8:22-9:3). Farzan did not specifically acknowledge Gen10 as his employer at any point in the conversation, instead saying: "I'm not an attorney to tell you exactly who is the employer, you or Wells Fargo or [if] it's . . . joint employment." (Id. at 8:11-14). The conversation ended with Farzan requesting an email from McDonald outlining her concerns in writing so that he could respond; McDonald agreed to this request, stating "we will make a decision from that point forward." (Id. at 9:4-8).

**5. Termination of Farzan's Employment**

Following her conversation with Farzan, McDonald emailed Davoren on November 2, 2011, recommending that "they discuss all options, including removing [Farzan] from the project." (Farzan's Opp. Papers, Ex. Pl-22: November 2, 2011 McDonald Email to Davoren). In

14

a call between McDonald and Davoren the same day, the determination to terminate Farzan was made, although Wells Fargo and Gen10 present differing accounts as to which company was ultimately responsible for the decision. (Wells Fargo Stmt. ¶ 97; Davoren Aff. (Dkt. No. 72) ¶ 16-17). Wells Fargo's position is that Davoren "did not object to" McDonald's recommendation of termination. (Id.). Gen10, on the other hand, states that Wells Fargo requested that Farzan be removed from his project and that Gen10 "agreed to do so." (Gen10 Stmt. ¶ 26; C. McDonald Tr.: 33:1-6).

On November 8, 2011, Gina Lipman ("Lipman"), a Gen10 employee, met with Farzan at the Wells Fargo office in New York. (Wells Fargo Stmt. ¶ 98). Lipman informed Farzan that his assignment at Wells Fargo *and* his employment with Gen10 were terminated as of that day. (Id. at ¶ 99; Farzan Tr.: 141:24-25).[9] When asked why, Lipman replied, "Because Wells Fargo is our client, and they asked us to terminate your employment. And since we value our relationship with our client, we honor their request and I have to terminate your employment." (Gen10 Stmt. ¶ 29; Farzan Tr.: 142:6-11). As they walked out of the building together after Farzan had collected his belongings, Lipman informed Farzan that she was impressed with his professionalism and that Gen10 would assist him in finding another position. (Gen10 Stmt. ¶ 30; Deposition Transcript of Gina Lipman, dated January 3, 2013 ("Lipman Tr."), attached to Sproule Decl. as Ex. I: 13:7-21). According to Farzan, he told Lipman that the termination was discriminatory and unfair, and that he would be taking legal action. (Gen10 Stmt. ¶ 31; Farzan Tr.: 142:23-25). During her deposition, Lipman could not recall whether Farzan had made these statements. (Lipman Tr.: 13:12-17).

---

[9]     Until this time, it was unclear from the record whether Farzan was only being taken off the Wells Fargo assignment, or whether he was also being fired from Gen10.

On November 9 and again on November 17, Farzan emailed McDonald to confirm whether his employment with Gen10 was indeed over. (Gen10 Stmt. ¶ 32; Farzan's Opp. Papers, Ex. Pl-22: November 9, 2011 and November 17, 2011 Farzan Emails to McDonald). McDonald responded by email on November 17 and confirmed that Farzan's employment with Gen10 had been terminated effective November 8. (Gen10 Stmt. ¶ 32; Farzan's Opp. Papers, Ex. Pl-22: November 17, 2011 McDonald Email to Farzan).

### 6. Farzan's EEOC Complaints

#### a. Farzan Files Charges on October 27 and November 9, 2011

Farzan filed a charge of discrimination against Wells Fargo with the EEOC on October 27, 2011, a few days after his October 24 emails with Davoren in which she explained to Farzan that he was a Gen10, and not a Wells Fargo, employee, but before his October 31 phone conversation with Tracy McDonald. (Am. Compl., Ex. F). In his submission to the EEOC, he noted that he was "the oldest person in the team and the only Iranian/Arab." (Am. Compl., Ex. F (attachment to EEOC Intake Questionnaire at 2)). Farzan alleged that he was discriminatorily passed over when Wells Fargo hired Christine McDonald, a "white female" and "much younger," for the permanent position that was discussed with him in November 2010. (Id.). Farzan also alleged that the December 31, 2011 end date imposed on his assignment amounted to unlawful termination. (Id.). In addition, he referred to an October 2011 email in which Christine McDonald "humiliated and harassed" him by criticizing his work in an email that was "copied to many people." (Id. at 4).

On November 9, 2011, the day after he was terminated, Farzan filed an EEOC complaint against Gen10, in which he similarly stated that he was the oldest person and only Iranian/Arab on the team and that "everyone in my team was treated better than me." (Am. Compl., Ex. J

16

(EEOC Intake Questionnaire at 2)).  Specifically, he charged that Gen10 first threatened to, and

then did, terminate him for "believ[ing] that [he] was an employee of Wells Fargo Bank."  (Id.).

Farzan also amended his original charge of discrimination against Wells Fargo to include an

allegation of retaliatory discharge for engaging in protected activity.  (Wells Fargo Stmt. ¶ 101;

Phillips Aff., Ex. V: Amended Charge of Discrimination).

### b.  Wells Fargo and Gen10 Receive Notice of Farzan's Filings

According to Wells Fargo, it received its first notice of Farzan's EEOC complaint on

November 9, 2011.  (Wells Fargo Stmt. ¶ 102; Phillips Aff., Ex. U: Notice of Charge of

Discrimination, date stamped as received November 9, 2011).  Wells Fargo asserts that it

therefore became aware of Farzan taking any action with the EEOC the day after he was

officially terminated, November 8, and about one week after the decision to terminate was made

on November 2.  (Id.).  Farzan contends, without citation to any evidence in the record, that

because the EEOC has a policy to send a notification of a charge of discrimination to the

respondent employer within ten days, Wells Fargo "must have received the EEOC notification

[of charge] by...11/7/2011.  Then Defendants decided to terminate him the next day."  (Farzan

Stmt. ¶ 144).  Farzan, again without a citation to the record, adds that Wells Fargo "probably

waited to date stamp the notification until after the Plaintiff was terminated."  (Id.).[10]

Gen10, for its part, first received notice of Farzan's EEOC charge against Wells Fargo

sometime around, but no later than, November 18, 2011: on that date, Tracy McDonald

circulated an email stating that she had been informed by a consultant at Wells Fargo about

---

[10]     It is true that by statute, the EEOC is required to serve on the employer "a notice of the
charge (including the date, place and circumstances of the alleged unlawful employment
practice) . . . within ten days" whenever a charge is filed. 42 U.S.C. § 2000e-5. Whether the
statutory ten-day deadline was met in this case is, of course, a separate question and Farzan
provides no evidence to substantiate his conclusory allegation that the time stamp was false.

Farzan's charge against the bank, and that all documents related to Farzan should be retained; she added that, as of that time, she was unaware of any claim filed against Gen10. (Gen10 Stmt. ¶ 33; Sproule Decl., Ex. G: November 18, 2011 McDonald Email). Gen10 was issued a notice of Farzan's November 9 charge against it at some point, but the copy submitted by Gen10 lacks a date stamp and nothing in the record identifies a precise date when Gen10 received it. (Sproule Decl., Ex. J).

### c. Altenburg's Allegedly Defamatory Position Statement

On January 26, 2012, Wells Fargo submitted its position statement in response to Farzan's EEOC charge, prepared by Amy Bernard ("Bernard"), an "EEO Consultant" at Wells Fargo. (Wells Fargo Stmt. ¶ 104; Phillips Aff., Ex. O: Wells Fargo EEOC Position Statement ("Wells Fargo EEOC Stmt.")). The position statement laid out Wells Fargo's responses to Farzan's allegations, describing Farzan alternately as "hostile," "confrontational," and "unprofessional," and recounting how he had tried to "bully" his way into a work extension by arguing with managers. (Wells Fargo EEOC Stmt. at 3-5). In his amended complaint, Farzan alleges that Bernard's position statement "repeat[s]" Altenburg's "slanders and libels to discredit him." (Am. Compl. ¶ 70). Although in preparing the position statement Bernard interviewed several Wells Fargo managers and personnel involved in Farzan's employment, including Altenburg, none of the negative descriptions of Farzan contained therein are specifically attributed to Altenburg or any other particular source. (Farzan Stmt. ¶ 166; Wells Fargo EEOC Stmt.).

## B. Procedural History

Farzan commenced this case on February 15, 2012 against Gen10 and five of its employees, alleging violations of Title VII, the ADEA, the NYSHRL, and the NYCHRL

(Compl. (Dkt. No. 1)), after receiving a "right to sue" letter from the EEOC on November 21, 2011 (Am. Compl., Ex. L).  On March 27, 2012, Judge Sullivan, acting sua sponte, dismissed Farzan's claims against four of the individual Gen10 employees as frivolous and lacking any arguably meritorious basis.  (Order of Service (Dkt. No. 7)).  In so ruling, Judge Sullivan noted the unavailability of individual liability under Title VII and the ADEA, and that, while individual defendants could be sued under state and city law, Farzan's complaint included few, if any, allegations that the four individuals actually participated in any of the alleged discrimination. (Id. at 3-4).  Claims against the fifth Gen10 employee were subsequently dismissed voluntarily on August 7, 2012.  (Dkt. No. 26).

Upon receipt of a "right to sue" letter from the EEOC with respect to his charge against Wells Fargo (Am. Compl., Ex. M), Farzan amended his complaint against Gen10 on June 21, 2012, adding Wells Fargo and its employees Altenburg, Bernard, and Christine McDonald as Defendants.  (Id.).  In addition to the discrimination claims, the amended complaint added specific allegations of unlawful retaliation, as well as defamation claims against Altenburg and Bernard.  (Id. at ¶¶ 76, 70).  Judge Sullivan subsequently referred the case to me for general pretrial supervision and to prepare reports and recommendations on any dispositive motions. (Order, dated June 26, 2012, Dkt. No. 14).

On November 20, 2012, Bernard and Christine McDonald, but not Altenburg, moved to dismiss for failure to state claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. No. 44).  On December 15, 2012, while the motion was pending, Farzan agreed to voluntarily dismiss his claims against McDonald.  (Dkt. No. 55).  On January 25, 2013, the Court issued a report recommending that Farzan's claims against Bernard be dismissed as well

19

(Dkt. No. 62), which was adopted by Judge Sullivan in a Memorandum and Order dated June 11, 2013. (Dkt. No. 83).

All three remaining defendants – Gen10, Wells Fargo, and Altenburg – moved for summary judgment on April 15, 2013, following the close of discovery. (Dkt. Nos. 69, 76).[11] The Wells Fargo defendants and Gen10 each submitted a memorandum of law and other papers in support of their motions. (Dkt. Nos. 70-74, 77-79). Farzan submitted his opposition papers on May 31, 2013. (Dkt. No. 82). After Wells Fargo and Gen10 submitted reply papers on June 21, 2013 (Dkt. Nos. 84, 86-87), Farzan requested permission to submit sur-reply papers; given that sur-replies are not generally permitted in federal court, and in light of the voluminous papers already submitted by Farzan in opposition to summary judgment, his request was denied. (Order, dated June 25, 2013, Dkt. No. 89).

## II.   DISCUSSION

### A.  Summary Judgment Standard

Summary judgment shall be granted if the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law" of the claims involved, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a genuine dispute as to a material fact exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor." Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012). A party must cite to "particular parts of materials in the record," including depositions, documents, affidavits, declarations, and admissions in support of

---

[11]      At that time, Bernard was still a party and also moved for summary judgment; however, her motion has been rendered moot given her dismissal from the case.

its assertions, and/or show that the adverse party "cannot produce admissible evidence" to support its own asserted facts. Fed. R. Civ. P. 56(c)(1)(B).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted); accord Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994) (defining court's objective as "issue-finding" and not "issue-resolution"). At this stage, the court does not engage in trial-like "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence." McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006). Instead, in considering the record, the court must "resolve all ambiguities and draw all reasonable inferences against the movant." Beyer v. County of Nassau, 524 F.3d 566, 160, 162 (2d Cir. 2008) (citation omitted). If the court subsequently determines that, even "with all permissible inferences and credibility questions resolved in favor of the [non-moving] party, there can be but one reasonable conclusion as to [a] verdict [for the moving party]," summary judgment is appropriate. Kaytor, 609 F.3d at 546 (quoting Anderson, 477 U.S. at 250).

The moving party bears the initial burden of establishing that there are no genuine disputes as to any material facts. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) (quoting Celotex, 477 U.S. at 323) (internal quotation marks omitted). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

21

475 U.S. 574, 586 (1986), and point to admissible evidence that could "reasonably support a

jury's verdict for the nonmoving party." Am. Home Assurance Co. v. Hapag Lloyd Container

Linie, GmbH, 446 F.3d 313, 315-16 (2d Cir. 2006).

The Second Circuit has warned that courts "must be especially cautious" when weighing

summary judgment in discrimination cases, given the rarity of an employer leaving clear and

direct evidence of its discriminatory intent in the record. Belfi v. Prendergast, 191 F.3d 129, 135

(2d Cir. 1999); see also Krasner v. City of New York, No. 11 Civ. 2048 (PGG), 2013 WL

5338558, at *7 (S.D.N.Y. Sept. 23, 2013) ("[A]ffidavits and depositions must be carefully

scrutinized for circumstantial proof [of discrimination].") (quoting Holcomb, 521 F.3d at 137).

"Nonetheless, summary judgment remains available for the dismissal of discrimination claims in

cases lacking genuine issues of material fact." Schiano v. Quality Payroll Sys., Inc., 445 F.3d

597, 603 (2d Cir. 2006) (quotations omitted). Indeed, where the appropriate legal standard is

met even after a cautious scrutiny of the record, there is no reason why summary judgment

would not be "appropriate even in the fact-intensive context of discrimination cases." Abdu-

Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001); see also Weinstock v.

Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) ("[T]he salutary purposes of summary judgment

– avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than

to . . . other areas of litigation.").

Finally, as a general rule, "the submissions of a pro se litigant must be construed liberally

and interpreted to raise the strongest arguments that they suggest." Sykes v. Bank of Am., 723

F.3d 399, 403 (2d Cir. 2013) (quoting Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474

(2d Cir. 2006). Specifically, "the pro se litigant should be given special latitude in responding to

a summary judgment motion." Warren v. Goord, 579 F. Supp. 2d 488, 493 (S.D.N.Y. 2008),

aff'd, 368 F. App'x 161 (2d Cir. 2010).  Nevertheless, the pro se litigant is not relieved from the

usual standards of summary judgment motions.  See Tavares v. City of New York, No. 08 Civ.

3782 (PAE) (JCF), 2011 WL 5877550, at *4 (S.D.N.Y. Oct. 17, 2011) (Report &

Recommendation) (citing Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995)), adopted by

2011 WL 5877548 (S.D.N.Y. Nov 23, 2011).  He must follow, for instance, Rule 56's

requirement that affidavits and declarations "be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant or declarant is competent to testify on

the matters stated."  Fed. R. Civ. P. 56(c)(4).  As a result, he may not make a "bald assertion,

completely unsupported by evidence" or any part of the record in order to create a factual dispute

for trial.  Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).  "[U]nsupported allegations do not

create a material issue of fact" for the benefit of the pro se litigant any more than they do for the

represented party.  Weinstock, 224 F.3d at 41; see also Fed. R. Civ. P. 56(e)(3).

## B.  Discrimination Claims

### 1.  Applicable Standards

#### a.  Title VII, the ADEA, and the NYSHRL

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge

any individual, or otherwise discriminate with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national

origin."  42 U.S.C. § 2000e-2(a)(1).  The ADEA utilizes nearly identical language to prohibit

discrimination by an employer on the basis of an individual's age.  29 U.S.C. §§ 623(a)(1).  The

NYSHRL covers analogous discriminatory acts against each of the groups protected under Title

VII and the ADEA.  N.Y. Exec. Law § 296(1)(a).  "[S]ince claims under the NYSHRL are

analyzed identically to claims under the ADEA and Title VII, the outcome of an employment

23

discrimination claim made pursuant to the NYSHRL is the same as it is under the ADEA and Title VII." Smith v. Xerox Corp., 196 F.3d 358, 363 n.1 (2d Cir. 1999), overruled on other grounds by Meacham v. Knolls Atomic Power Lab., 461 F.3d 134 (2d Cir. 2006).

To survive a motion for summary judgment, the discrimination plaintiff relying on circumstantial evidence, as Farzan does, must satisfy the seminal, three-part burden-shifting test laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); McPherson v. New York City Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006). Although first articulated in the context of Title VII, this same burden-shifting analysis is equally applied to discrimination claims brought under the NYSHRL and the ADEA. Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010) (NYSHRL); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001) (ADEA). The plaintiff's initial burden is to prove "by the preponderance of the evidence a prima facie case of discrimination." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). To do so under the McDonnell Douglas framework, the plaintiff must establish that: "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012) (quotation and alteration omitted).

While the first two prongs are relatively straightforward, the third and fourth prongs merit additional discussion. An adverse employment action is any "materially adverse change in the terms and conditions of employment." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks omitted). Examples of materially adverse actions vary and can be context-dependent, but generally include: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

24

significantly diminished material responsibilities, or other indices unique to a particular situation." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003)).  An inference of discrimination may be established from a variety of circumstances, such as: "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009) (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994) (internal citations omitted)).

"A plaintiff's burden in presenting evidence to support a prima facie case is de minimis." Nolley v. Swiss Reinsurance Am. Corp., 857 F. Supp. 2d 441, 455 (S.D.N.Y. 2012) aff'd sub nom. Nolley v. Swiss Re Am. Holding Corp., 523 F. App'x 53 (2d Cir. 2013) (citing Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009)).  However, "[m]ere allegations are insufficient to defeat summary judgment," Duviella v. JetBlue Airways, 353 F. App'x 476, 478 (2d Cir. 2009), and "[a] plaintiff cannot establish a prima facie case based on purely conclusory allegations of discrimination, absent any concrete particulars." Dorfman v. Doar Communications, Inc., 314 F. App'x 389, 390 (2d Cir.).

Provided the plaintiff makes out a prima facie case, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. United States v. City of New York, 717 F.3d 72, 84 (2d Cir. 2013) (quoting Burdine, 450 U.S. at 253).  If the defendant can do so, the burden shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253.  A plaintiff is not

"required to prove the prohibited motivation was the sole or even the principal factor in the decision, or that the employer's proffered reasons played no role in the employment decision." Lioi v. New York City Dep't of Health & Mental Hygiene, 914 F. Supp. 2d 567, 583 (S.D.N.Y. 2012) (citations omitted). He must nevertheless present evidence that "the legitimate, nondiscriminatory reasons proffered by the employer were false," Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996), permitting a rational inference that "the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trustees of Columbia Univ. in City of New York, 131 F.3d 305, 312 (2d Cir. 1997). Importantly, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quoting Burdine, 450 U.S. at 253) (alteration in original).

### b. The NYCHRL

The NYCHRL largely tracks the language of the NYSHRL. N.Y.C. Admin. Code § 8–107(1)(a).[12] Nevertheless, while the city law was long construed as being coextensive with the comparably worded federal and state discrimination statutes, the Second Circuit has recently emphasized that following passage of New York City's Local Civil Rights Restoration Act of 2005 ("Restoration Act"), N.Y.C. Local L. No. 85, "courts must analyze NYCHRL claims separately and independently." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) ("[D]istrict courts [have] continued—erroneously—to apply federal standards to NYCHRL claims."). The Restoration Act directs that the NYCHRL be subject to an "independent liberal construction analysis *in all circumstances*," given its "uniquely broad and

---

[12]     However, unlike the federal and state laws, the NYCHRL also prohibits discrimination motivated by perceived, and not merely actual, status. N.Y.C. Admin. Code § 8–107(1)(a).

remedial purposes, which go beyond those of counterpart state or federal civil rights laws." St. Jean v. United Parcel Serv. Gen. Serv. Co., 509 F. App'x 90, 91 (2d Cir. 2013) (quoting Bennett v. Health Mgmt. Sys., Inc., 92 A.D.3d 29, 34, 936 N.Y.S.2d 112 (1st Dep't 2011) (emphasis in original). Title VII, the ADEA, and the NYSHRL represent the "floor below which the City's Human Rights Law may not fall." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (citing Restoration Act § 1).

In Mihalik, the Second Circuit addressed the fact that, following the Restoration Act, "[i]t is unclear whether, and to what extent, the McDonnell Douglas burden-shifting analysis has been modified for NYCHRL claims." 715 F.3d at 110, n.8. But the court suggested that the issue did not necessarily require resolution as the NYCHRL could be read as merely simplifying the existing discrimination inquiry. Id. Indeed, while heeding the independent analysis requirement of the NYCHRL, courts in the Second Circuit have applied its liberal standards to the basic McDonnell Douglas framework, an approach the Court adopts here. See, e.g., Anderson v. City of New York, No. 06 Civ. 5726 (RRM), 2012 WL 6720694, at *7 (E.D.N.Y. Dec. 27, 2012); Lytle v. JPMorgan Chase, No. 08 Civ. 9503 (DAB) (JLC), 2012 WL 393008, at *19 (S.D.N.Y. Feb. 8, 2012) (Report and Recommendation), adopted by 2012 WL 1079964 (S.D.N.Y. Mar. 30, 2012), aff'd, 518 F. App'x 49 (2d Cir. 2013); Williams v. Regus Mgmt. Group, LLC, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011); Zambrano-Lamhaouhi v. New York City Bd. of Educ., 866 F. Supp. 2d 147, 160 (E.D.N.Y. 2011). For instance, the more expansive standard of the NYCHRL eases the third prong of plaintiff's prima facie case by removing the materiality requirement of an adverse employment action; instead, "under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty." Williams, 836 F. Supp. 2d at 173. To round out the prima facie case, the

27

plaintiff must show that "she has been treated less well than other employees because of her [protected status]." Williams v. New York City Hous. Auth., 61 A.D.3d 62, 78 (2009); accord Sealy v. Hertz Corp., 688 F. Supp. 2d 247, 258 (S.D.N.Y. 2009); Kalp v. Kalmon Dolgin Affiliates of Long Island Inc., No. 11 Civ. 4000 (JG), 2013 WL 1232308, at *10 (E.D.N.Y. Mar. 27, 2013). If a prima facie case is thus established, the second and third parts of the burden-shifting rubric – proffer of employer's non-discriminatory reason and evidence of pretext – will be applied. See Williams, 836 F. Supp. 2d at 173-74.

Notwithstanding this lower threshold, "the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." Ballard v. Children's Aid Soc'y, 781 F. Supp. 2d 198, 211 (S.D.N.Y. 2011) (quoting Deshpande v. Medisys Health Network, Inc., No. 07 Civ. 375 (KAM), 2010 WL 1539745, at *22 (E.D.N.Y. Apr. 16, 2010)); see Sealy, 688 F. Supp. 2d. at 258 (plaintiff must still meet prima facie case under NYCHRL by "preponderance of evidence"). If the non-moving party cannot establish any genuine dispute as to material fact, "summary judgment still can be an appropriate mechanism for resolving NYCHRL claims." Mihalik, 715 F.3d at 111 (noting that federal procedural law governs even in light of city's substantive legal standards and collecting state court cases that still found summary judgment appropriate for NYCHRL claims).

### c. Joint Employer Liability

As a threshold matter, a discrimination claim may only be asserted by a plaintiff against his "employer." See, e.g., 42 U.S.C. § 2000e-2(a). In cases such as the present one where more than one potential employer exists, "liability may be found when separate legal entities have chosen to handle certain aspects of their employer-employee relationships jointly." Forsythe v. New York City Dep't of Citywide Admin. Servs., 733 F. Supp. 2d 392, 397 (S.D.N.Y. 2010),

aff'd, 428 F. App'x 40 (2d Cir. 2011) (quoting Lima v. Addecco, 634 F. Supp. 2d 394, 400

(S.D.N.Y. 2009) (internal quotation marks omitted)).  According to the Second Circuit, under

this joint employer theory: "an employee, formally employed by one entity, who has been

assigned to work in circumstances that justify the conclusion that the employee is at the same

time constructively employed by another entity, may impose liability for violations of

employment law on the constructive employer."  Arculeo v. On-Site Sales & Mktg., LLC, 425

F.3d 193, 198 (2d Cir. 2005).  Thus, the concept of employer in the discrimination context must

be understood "functionally, to encompass persons who are not employers in conventional terms,

but who nevertheless control some aspect of an employee's compensation or terms, conditions,

or privileges of employment."  Gore v. RBA Grp., Inc., No. 03 Civ. 9442 (KMK), 2008 WL

857530, at *4 (S.D.N.Y. Mar. 31, 2008) (citation omitted).  Along with control, courts have also

looked to "commonality of hiring, firing, discipline, pay, insurance, records, and supervision"

between employer-entities.  Lima, 634 F. Supp. 2d at 400.  Ultimately, joint employment is

"sufficiently broad to encompass any party who significantly affects access of any individual to

employment opportunities."  Laurin v. Pokoik, No. 02 Civ. 1938 (LMM), 2004 WL 513999, at

*8 (S.D.N.Y. Mar. 15, 2004) (quoting Kern v. City of Rochester, 93 F.3d 38, 45 (2d Cir.1996)).

         The joint employer doctrine "has been applied to temporary employment or staffing

agencies and their client entities" that mirror the contingent worker arrangement between Wells

Fargo and Gen10.  Lima, 634 F. Supp. 2d at 400.  See also DeWitt v. Lieberman, 48 F. Supp. 2d

280, 288 (S.D.N.Y. 1999) (employment agency that paid employee and client entity that

supervised work found to be joint employers under Title VII); Amarnare v. Merrill Lynch,

Pierce, Fenner & Smith, Inc., 611 F. Supp. 344, 347-49 (S.D.N.Y. 1984) (plaintiff was employee

of both temporary employment agency and client entity for Title VII purposes).  Wells Fargo

supervised Farzan on a daily basis, assigned him work, set his schedule, and had the power to

extend his assignment (Farzan Stmt. ¶¶ 40, 50, 59; Wells Fargo Stmt. ¶ 6), all indications of its

control over the terms and conditions of employment. See Gore, 2008 WL 857530, at *4.

Gen10 formally employed Farzan for payroll, benefits, and tax reporting purposes. (Farzan

Stmt. ¶¶ 48-49, 52-53; Farzan Tr.: 26:21-23). The two entities acted in concert in hiring Farzan

and later in jointly deliberating about firing him, thereby both exercising authority over his initial

and continued access to employment; indeed, Gen10 and Wells Fargo each contend that it was

the other entity that made the ultimate decision to terminate Farzan. (Davoren Aff. ¶¶ 16-17; C.

McDonald Tr.: 33:1-6). Therefore, regardless of how Wells Fargo and Gen10 internally

classified Farzan's employment status, they both face potential liability as Farzan's joint

employers.

### d. Individual Liability

It is well-established that neither Title VII nor the ADEA provide for individual

liability. Lore v. City of Syracuse, 670 F.3d 127, 169 (2d Cir. 2012) (Title VII); Thomas v. New

York City Dep't of Educ., 938 F. Supp. 2d 334, 354-55 (E.D.N.Y. Mar. 29, 2013) (ADEA).

Under both statutes, personal liability is foreclosed for "even those with supervisory liability

over the plaintiff." Guerra v. Jones, 421 F. App'x 15, 17 (2d Cir. 2011); see also Tomka v.

Seiler Corp., 66 F.3d 1295, 1313 (2d. Cir. 1995) ("[I]ndividual defendants with supervisory

control over a plaintiff may not be held personally liable under Title VII."), abrogated on other

grounds by Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). Therefore, all claims

under Title VII and the ADEA against the remaining individual defendant Altenburg must be

dismissed as a matter of law.

By contrast, Altenburg remains potentially liable under the state and local discrimination statutes. "Individual employees may be held personally liable under the NYSHRL and NYCHRL if they participate in discriminatory conduct." Morgan v. N.Y. State Atty. Gen.'s Office, No. 11 Civ. 9389 (PKC), 2013 WL 491525, at *13 (S.D.N.Y. Feb. 8, 2013) (citations omitted). As the two statutes employ nearly identical language, they share standards for imposing individual liability. Davis-Bell v. Columbia Univ., 851 F. Supp. 2d 650, 687 (S.D.N.Y. 2012). Liability may attach for both carrying out direct acts of discrimination and for aiding and abetting such conduct. Id. However, in order to prevail on an aiding and abetting theory, "liability must first be established as to the employer/principal before accessorial liability can be found." Jain v. McGraw-Hill Companies, Inc., 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011) (citation omitted), aff'd, 506 F. App'x 47 (2d Cir. 2012).

### 2. Farzan Cannot Establish a Prima Facie Case of Discriminatory Termination

Turning to the substance of Farzan's claims, the Court first addresses Farzan's allegation that he was "terminated based on [his] age, race, national origin, religion, [and] gender." (Am. Compl. ¶ 78).[13] It is undisputed that Farzan is an Iranian-American, Muslim man in his late sixties who was qualified for his position as a technical analyst. (Am. Compl. ¶ 1; Altenburg Tr.: 26: 21-23). As it is also self-evident that termination constitutes a qualifying adverse employment action under all the applicable discrimination statutes, Farzan has satisfied the first three elements of his prima facie case.

To meet the fourth and final prong for his federal and state claims, Farzan must demonstrate that his discharge "occurred under conditions giving rise to an inference of

---

[13]     Although Farzan alleges religious discrimination, he appears to abandon this claim as he makes no reference to it in his papers nor does he offer any evidence that he suffered discrimination because he is a Muslim.

31

discrimination." Reynolds, 685 F.3d at 202. To do so, Farzan first asserts that he "was replaced by non-Iranian younger employees." (Farzan Mem. at 15). "It is well settled . . . that the mere fact that a plaintiff was replaced by someone outside the protected class will suffice to establish the required inference of discrimination at the prima facie stage." Dabney v. Christmas Tree Shops, No. 10 Civ. 8734 (CS), 2013 WL 3820668, at *5 (S.D.N.Y. July 24, 2013) (quoting Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) (internal quotation marks omitted)); see Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 359 (S.D.N.Y. 2006) (prima facie case established where African-American man replaced by white woman), aff'd, 629 F.3d 276 (2d Cir. 2010); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000) (inference of age discrimination raised where 57-year old plaintiff replaced by two substantially younger employees). Farzan, however, does not identify anyone outside of his protected class(es) who a reasonable trier of fact could find replaced him.

Farzan lists a series of permanent and contingent workers who worked at Wells Fargo at various times spanning his entire period of employment as replacements: Singhal, in his mid-forties, hired in May 2010; Christine McDonald, in her mid-fifties, hired in October 2010; Aggarwal, in her mid-thirties, hired in December 2010; Kothari, in his mid-thirties, hired in November 2010; Dahkal, in his mid-thirties, hired in March 2011; Judd, in his mid-thirties, hired in December 2009; and Sabu Abraham, in his mid-thirties, hired in September 2011. (Farzan Stmt. ¶¶ 180, 184, 190, 193, 197, 202, 204). All are described as "non-Iranian." (Id.). As an initial matter, Farzan does not cite to any part of the evidentiary record that supports his contentions about the individual characteristics of Judd, Dahkal, or Aggarwal. The Court need not consider such unsupported assertions of fact. See Fed. R. Civ. P. 56(e)(3). However, even if the Court did accept them at face value, Farzan still fails to adduce additional, necessary facts

32

about these individuals' specific job responsibilities, namely, whether they were related in any way to Farzan's functions.  While a replacement for a discriminatorily terminated plaintiff need not be hired externally after the fact and can instead be an existing co-worker, it is elementary that the plaintiff must still show that *his particular job functions* were taken over by the replacement.  See, e.g., Westbrook v. City Univ. of New York, 591 F. Supp. 2d 207, 227 (E.D.N.Y. 2008) (analyzing delegation of fired employee's specific job responsibilities to a number of co-workers).

Similarly unavailing to Farzan are the remaining co-workers on his list for whom an admissible evidentiary record does exist.  Singhal, an Indian man in his fifties, moved into a permanent, direct employee position with Wells Fargo in June 2010, 17 months *before* Farzan's termination.  (Altenburg Aff., ¶ 27; Farzan Stmt. ¶ 183).  No evidence is offered to suggest what Singhal's functions entailed or how they may have overlapped with Farzan's.  Christine McDonald, a Caucasian, non-Iranian, non-Muslim in her fifties, was hired *a full year* before Farzan's discharge for a position that also has no demonstrated overlap with Farzan's (indeed Farzan considered accepting that role to transition out of his current job).  (C. McDonald Tr.: 5:16-17, 6:4-9; 19:11-24).  Consequently, there is no basis on which it can be reasonably concluded that either Singhal or McDonald "replaced" Farzan.  See, e.g., Green v. Vermont Country Store, 191 F. Supp. 2d 476, 483 (D. Vt. 2002) (no inference of discrimination under Vermont Fair Employment Practices Act, analyzed under same framework as Title VII and ADEA, where alleged replacement hired prior to plaintiff's termination had different title and mostly different job responsibilities).

Kothari and Abraham come closer to fitting the bill, but they too fall short.  Kothari, a Muslim man originally from India and in his thirties, joined Wells Fargo in November 2010, a

year before Farzan's termination, as a business systems consultant/technical analyst. (Kothari

Tr.: 4:11-14; 5:4-5, 20-22; 6:10-17; 7:9-13).  At his deposition, he testified that he took over a

few projects from Farzan in October 2011. (Id.: 21:2-4).  Abraham, identified as a "non-

Iranian," non-Muslim man in his early thirties, joined Wells Fargo in September 2011, also as a

technical analyst. (Abraham Tr.: 4:3-4, 14-17, 22-25).  Like Kothari, Abraham had projects

transferred to him from Farzan in October 2011, taking over "a couple of interfaces [Farzan] was

working on." (Id.: 20-23).  Wells Fargo's hiring of two additional members of Farzan's team,

however, does not by itself support an inference that they were intended to be, or eventually

became, Farzan's replacements.  And although both Kothari and Abraham took on projects that

were formerly Farzan's in the month before his termination, Farzan adduces no evidence

indicating in any way that these project transfers (the nature and scale of which are unspecified)

were related to an effort to replace him.  As a result, the allegations as to the status of Kothari,

Abraham, and the laundry list of co-workers that Farzan identifies as non-Iranian, younger

replacements are no more than unsupported conjecture and surmise.

As an alternate means to demonstrate discriminatory circumstances surrounding his

termination, Farzan also contends that within his team, "6 female managers [ ] fired 7 male

contingent workers," including himself. (Farzan Mem. at 16-17).  A showing that employees

who are members of a protected group are categorically targeted for termination, while

employees outside of that group are not, is ordinarily sufficient to make out a prima facie case.

See Windham v. Time Warner, Inc., 275 F.3d 179, 188 (2d Cir. 2001) (evidence showing that

three out of four African-American employees were fired from department, while no employees

of other races were terminated, supported inference of racial discrimination); Maresco v. Evans

Chemetics, Div. of W.R. Grace & Co., 964 F.2d 106, 113 (2d Cir. 1992) (termination of two or

three older employees while none of twenty younger workers were affected gives rise to inference of impermissible personnel decision based on age). Farzan claims that Altenburg admitted in her affidavit that she "forced" seven male contingent workers "to leave," but it is clear from the record that she is only describing contingent workers whose assignments at Wells Fargo had simply expired at different times over the course of years. (Farzan Stmt. ¶ 215; Altenburg Aff. ¶¶ 12-19). Nowhere in the record is there any indication that these workers were in fact terminated, let alone on the basis on their gender. (Farzan's assertion that the management team was comprised of six women is also not substantiated by any part of the record.). Consequently, Farzan makes a "bald assertion, completely unsupported by evidence," one that "is not sufficient to overcome a motion for summary judgment." Lee, 902 F. Supp. at 429 (quoting Carey, 923 F.2d at 21).

### 3.  Even if Farzan Could Establish a Prima Facie Case, Defendants Proffer a Legitimate, Non-Discriminatory Reason for His Termination

Even assuming that Farzan could establish a prima facie case of discriminatory termination, Defendants offer a legitimate, non-discriminatory rationale for their actions. According to the undisputed facts, Farzan's termination was due to his refusal to acknowledge his status as a Gen10, and not a Wells Fargo, employee. According to the Wells Fargo defendants, "despite repeated attempts" to explain to Farzan his status as a Gen10 employee in October 2011, culminating in the telephone conversation with Tracy McDonald, he insisted that "he was a Wells Fargo employee and entitled to an indefinite position." (Wells Fargo Mem. at 26). Gen10 adds that Farzan "was fully aware that Wells Fargo's managers were upset by the emails that he had sent them stating he was a Wells Fargo employee" and that "[Wells Fargo] communicated their displeasure to both him and Gen10," but he refused to acknowledge that Gen10 was his sole employer. (Gen10 Mem. at 15). Indeed, when Altenburg informed him that

35

his 18-month contingent assignment would not be extended, Farzan responded by email by stating that the "policy does not apply to me." (Phillips Aff., Ex. M: October 24 email).

Viewed in the light most favorable to Farzan, his insistence that he was a Wells Fargo employee entitled to job security and his refusal to recognize that he was subject to policies like the assignment length cap constitute facially legitimate reasons for his termination. See, e.g., Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000) ("An employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command . . . ."). Farzan presents no evidence to suggest, much less establish, that Wells Fargo's and Gen10's displeasure at his persistent assertions that he was exempt from their policies was pretextual. Indeed, Farzan himself acknowledges that Defendants terminated him because he believed that he was an employee of Wells Fargo, alleging that he was discriminated against on the basis of that very belief. (Am. Compl. ¶ 76). Because the underlying facts of the offered non-discriminatory reason for termination are thus undisputed, Farzan can raise no genuine issue of material fact as to whether the Defendants' reasons were pretextual as a matter of law. See Pruitt v. Metcalf & Eddy Inc., No. 03 Civ. 4780 (DF), 2006 WL 39621, at *14 (S.D.N.Y. Jan. 6, 2006) (no triable issue surrounding pretext because plaintiff conceded facts underlying insubordination, employer's proffered basis for termination); Allen v. St. Cabrini Nursing Home, Inc., 198 F. Supp. 2d 442, 451 (S.D.N.Y. 2002), aff'd, 64 F. App'x 836 (2d Cir. 2003) (no issue of material fact surrounding alleged pretext where plaintiff admitted she refused to cooperate in internal investigation).

Under the independent analysis required by the NYCHRL, Farzan's city law discriminatory termination claim likewise falls short. As explained, Farzan adduces no other

36

evidence aside from conjecture and bald assertions that could reasonably establish that discriminatory animus played any part in his employers' decision to terminate him. At a minimum, NYCHRL claims, like their federal and state counterparts, still "require a causal connection between [plaintiff's] termination and facts sufficient to give rise to an inference of discriminatory motive, without which each of these claims must fail." Bateman v. Project Hospitality, Inc., No. 07 Civ. 2085 (RRM), 2009 WL 3232856, at *4 (E.D.N.Y. Sept. 30, 2009). Even under the more permissive standard of the NYCHRL, therefore, Farzan has "failed to raise a triable issue as to whether [he] was treated less well than other employees based in whole or in part on discrimination, and not because of the non-discriminatory reasons proffered by" his employers. Simmons v. Akin Gump Strauss Hauer & Feld, LLP, 508 F. App'x 10, 14 (2d Cir. 2013) (upholding summary judgment on NYCHRL racial discrimination claim).

In sum, Farzan has not proffered admissible evidence to meet his initial burden of establishing a prima facie case. And even if Farzan could meet that burden, Defendants offer a non-discriminatory and non-pretextual reason for his discharge. Consequently, Defendants are entitled to summary judgment on Farzan's discriminatory termination claims.

### 4. Farzan Cannot Establish a Prima Facie Case of Failure to Promote

Farzan also alleges that Wells Fargo failed to "convert" him from temporary contingent worker status to a permanent position with the company despite its promises to do so. (See Am. Compl. ¶¶ 19, 21-2, 30). Reading Farzan's pro se pleadings and submissions liberally, the Court construes Farzan's contention that he was denied conversion as a discriminatory failure-to-promote claim. See Triestman, 470 F.3d at 472 (pro se litigant's submissions must be interpreted to raise the strongest arguments that they suggest). Denial of promotion, including in the form of refusing to hire a temporary worker on a permanent basis, is recognized by courts as a materially

37

adverse, and therefore more than trivial, employment action. Mills v. S. Connecticut State Univ., 519 F.App'x 73, 75 (2d Cir. 2013) ("[failure to promote is] within the core activities encompassed by the term 'adverse actions'") (citing Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002)); see also Chansamone v. IBEW Local 97, 523 F. App'x 820, 822, n.2 (2d Cir. 2013) (treating employer's refusal to hire temporary employee for permanent position as potential failure to promote).

For various reasons, however, Farzan cannot make a prima facie showing on any failure to promote claims. To begin with, his federal claims are time-barred. Under Title VII and the ADEA, a plaintiff filing a charge with the EEOC, as opposed to a state administrative agency, must do so within 180 days after the occurrence of an alleged unlawful practice. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. §§ 626(d)(1); see Sundaram v. Brookhaven Nat. Labs., 424 F. Supp. 2d 545, 559 (E.D.N.Y. 2006). The Supreme Court has clarified that an employer's failure to promote is a "discrete discriminatory act" that "starts a new clock for filing charges alleging that act." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113-15 (2002) (distinguishing discrete acts from continuing violations like hostile work environment claims which are premised on theory of "cumulative effect"); Petrosino v. Bell Atl., 385 F.3d 210, 220 (2d Cir. 2004) (each failure to promote is discrete act which gives rise to separate cause of action that must be timely brought). In other words, because Farzan filed his EEOC charge against Wells Fargo on October 27, 2011, he is now precluded from asserting any failure to promote claims arising before April 30, 2011, 180 days prior to his filing. Yet the only two instances in the record that could potentially give rise to a "discrete act" of a failure to promote, Farzan's consideration of the "technology relationship manager" vacancy in June 2010 and the "business

system consultant" vacancy in November 2010, occurred months before this date.[14]  Although

the record does not indicate how and when the June 2010 position was ultimately filled, Farzan

points to no evidence that he was subsequently denied the job at some point after April 30, 2011,

nearly ten months later.  As for the consultant vacancy in November 2010, that position was

filled by Christine McDonald on December 1, 2010, well before the start of the 180-day window.

(C. McDonald Tr.: 15:6-7).

By contrast, Farzan's potential failure to promote claims pose no timeliness concerns

under the NYSHRL and the NYCHRL, which are governed by a three-year statute of limitations,

and thus must be analyzed on the merits.  N.Y. C.P.L.R. § 214; N.Y. City Admin. Code § 8-

502(d); see also Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (three-

year limitation under NYSHRL); Whaley v. City Univ. of New York, 555 F. Supp. 2d 381, 401

(S.D.N.Y. 2008) (three-year limitation under NYCHRL).  Nevertheless, the evidence, construed

in the light most favorable to Farzan, does not bear out any possibility of establishing a prima

facie case.

The claim brought under the NYSHRL is analyzed, as any timely federal claims would

be, under the McDonnell Douglas framework, adapted with elements specific to the failure-to-

promote inquiry.  However, "courts [in this circuit] have yet to adopt a test for analyzing failure

to promote claims under the NYCHRL."  Campbell v. Cellco P'ship, 860 F. Supp. 2d 284, 297

(S.D.N.Y. 2012).  Absent a more specific rubric, the Court will adopt the approach taken by

---

[14]      Resolving all ambiguities and factual disputes concerning his conversations with
Altenburg in Farzan's favor, the Court assumes for purposes of this motion that Wells Fargo
made an ongoing promise to Farzan to work towards his conversion to a permanent position,
including as late as September 2011. (Farzan Aff. ¶ 54).  Nonetheless, an open promise to
provide such a position in the future does not satisfy the requirement, discussed below, that a
plaintiff must have actually *applied for* a position in order to substantiate a failure to promote
claim. See Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998) (citation omitted).

other courts in recent decisions, "us[ing] the Title VII and NYSHRL standard as a guide, while keeping the NYCHRL's more liberal standards in mind." Davis-Bell v. Columbia Univ., 851 F. Supp. 2d 650, 679 (S.D.N.Y. 2012) (citing Campbell, 860 F. Supp. 2d at 297); accord Ellis v. Century 21 Dep't Stores, No. 11 Civ. 2440 (MKB), 2013 WL 5460651, at *17, n.15 (E.D.N.Y. Sept. 28, 2013).

Assuming the first two prongs of the prima facie case are not in doubt (i.e., that Farzan was a member of a protected class and qualified for the position he held), the plaintiff must also show that he "applied and was qualified for a job for which the employer was seeking applicants." Brown, 163 F.3d at 709 (citation omitted).[15] He must then demonstrate that he "was rejected under circumstances which give rise to an inference of discrimination." Burdine, 450 U.S. at 253; see Morris v. Ales Grp. USA, Inc., No. 04 Civ. 8239 (PAC), 2007 WL 1893729, at *9 (S.D.N.Y. June 29, 2007) ("An inference of discrimination . . . may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications, or if the position was filled by someone not a member of plaintiff's protected class.") (citations omitted). Importantly, evidence of a *specific application* to a particular position is necessary to "ensure[ ] that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer." Petrosino, 385 F.3d at 227 (quoting Brown, 163 F.3d at 710) (alterations in original). In other words, mere requests for consideration for promotion or general expressions of interest over time do not suffice. See Brown, 163 F.3d at 710. Although there is an exception to the rule, it is a narrow one: "to be excused from the specific application requirement, an employee must demonstrate that (1) the

---

[15]   Although McDonnell Douglas specifically dealt with a claim arising from an employer's refusal to hire, the case law applies its same standards to failure to promote claims. See, e.g., O'Leary v. NY State Unified Court Sys., No. 05 Civ. 6722 (HB), 2007 WL 2244483, at *5, n.14 (S.D.N.Y. Aug. 6, 2007).

vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the

vacancy before it was filled or (b) attempted to apply for it through informal procedures

endorsed by the employer." Petrosino, 385 F.3d at 227.

By his own admission, Farzan never submitted a formal application for the technology

relationship manager position he discussed with Altenburg in June 2010.  A portion of the

transcript from Farzan's deposition is illuminating on this point:

> Q.  Your idea of applying is sending an e-mail with an expression of an interest in
> a position?
> A.  Yes.
> Q.  But you never applied online or through Wells Fargo's website?
> A.  I made a call –
> Q.  Did you?  Did you apply online?
> A.  No.  No.

(Farzan Tr.: 291:6-14).  Although Farzan asserts that he did "apply" for the vacancy in a sense, it

appears that this "application" amounted to no more than the conversations he had with

Altenburg and the email he sent to her with a description of the position and a request that she

"please advise."  (Farzan Aff. ¶ 45; Phillips Aff., Ex. F).  Absent some formalized application to

a specific position, Farzan's claim must fail as a matter of law.  See, e.g., Fraser v. Fiduciary

Trust Co. Int'l, No. 04 Civ. 6958 (PAC), 2009 WL 2601389, at *8 (S.D.N.Y. Aug. 25, 2009)

(African American investment management executive who desired post ultimately filled by

Caucasian cannot create an inference of racial discrimination because he never actually applied

for position); Morris v. Ales Grp. USA, Inc., No. 04 Civ. 8239 (PAC), 2007 WL 1893729, at *9

(S.D.N.Y. June 29, 2007) (consultant cosmetologist who did not submit actual applications for

direct payroll positions and merely expressed interest to employer fails to establish prima facie

case); Colucci v. N.Y. Times Co., 533 F. Supp. 1005, 1007 (S.D.N.Y. 1982) ("informal oral

request" was "no substitute for applying").[16]  Farzan's failure to apply also does not fall into the narrow exception to the specific application rule, as there is no doubt that the vacancy was posted publicly; indeed, Farzan acknowledges that Altenburg referred him to the publicized list in the first place. (Farzan Aff. ¶ 45).

Farzan is also unable to build a prima facie case around the November 2010 business system consultant position.  Assuming Wells Fargo did in fact offer him that job, Farzan nonetheless conceded in a September 2011 email that he "couldn't accept the offer" because the salary for the position was less than what he was willing to take.  (Phillips Aff., Ex. G).  A plaintiff that turns down an offer of a position may not satisfy a prima facie case based on a failure to promote.  See Rothenberger v. N.Y. City Police Dep't, No. 06 Civ. 868 (NGG), 2008 WL 2435563, at *7 (E.D.N.Y. June 16, 2008) ("Quite simply, [because] plaintiff was offered the position and he turned it down[,] [p]laintiff cannot establish an essential element of a prima facie case.").  By definition, an applicant who declines an offered job – or who never applied to begin with – cannot have been "*rejected* under circumstances which give rise to an inference of discrimination." Burdine, 450 U.S. at 253 (emphasis added).

This logic holds true even through the more liberal lens of the NYCHRL.  Because he was never actually rejected for a position, Farzan produces no evidence that he suffered an adverse action even under the NYCHRL standard of merely differential treatment.  Thus, "[t]he same lack of relevant evidence dooms h[is] New York City law claim." Davis-Bell, 851 F.

---

[16]    Farzan asserts that other contingent workers, such as Singhal, Kothari, Aggarwal, and Dahkal, were all successfully converted by Wells Fargo to permanent positions. (Farzan Mem. at 13-14).  But as Wells Fargo points out, the crucial difference is that each of these contingent workers submitted actual applications, which are included in the record. (Wells Fargo Repl. Mem. at 8) (citations omitted).

Supp. 2d at 680 (summary judgment granted for employer as to NYCHRL failure to promote claim where plaintiff first did not apply and then subsequently did and was offered job).

Accordingly, as Farzan cannot show that he actually applied for and was rejected for a permanent position, Defendants are entitled to summary judgment on the state and city failure to promote claims. Farzan's federal failure to promote claims, which are analyzed under an analogous rubric, similarly falter on the merits, and in any case should be dismissed on the alternative ground that they are time-barred.

### 5. Farzan Cannot Establish a Prima Facie Case Arising from Wells Fargo's Refusal to Extend His Assignment

Related to Farzan's failure to promote claims is his contention that Wells Fargo discriminated against him in imposing its policy of capping contingent worker assignment lengths. Farzan asserts that while Wells Fargo refused to extend his assignment beyond his December 2011 end-date, citing the 18-month cap on contingent workers terms, it did not apply any such policy to two non-Iranian, younger individuals: Praveen Palem ("Palem") and David Judd. (See Am. Compl. ¶ 67; Farzan Mem. at 13). As a threshold matter, Farzan does not cite to any part of the evidentiary record to support his contentions about the age, national origin, or other characteristics of either Palem or Judd. Even accepting these assertions, however, Farzan is unable to establish a prima facie case of discrimination around Wells Fargo's refusal to extend his contingent worker assignment.

No jury could reasonably find from the record that discriminatory motive played a role in Wells Fargo's refusal to extend Farzan's tenure beyond December 2011. Wells Fargo contends, and Farzan does not offer evidence to refute, that the majority of its contingent workers completed shorter assignments than Farzan, with all but three individuals held to the 18-month cap. (Wells Fargo Mem. at 16-17; see Altenburg Aff. Exs. A-G (human resources documents for

43

contingent workers)).  Wells Fargo acknowledges that Palem and Judd were both exceptions whose terms were extended past 18 months: Judd was kept on for 30 months and Palem finished two stints, one from June 2006 to December 2008 and a second from January 2009 through March 2011.  (Wells Fargo Rep. Mem. at 10).  Wells Fargo also admits that another contingent worker, Sabu Abraham, finished a 20-month assignment. (Wells Fargo Mem. at 16).  However, Wells Fargo's contingent worker policy allowed for extensions beyond 18 months on a case-by-case basis depending on business needs and supervisor discretion.  (Wells Fargo Stmt. ¶ 6; Altenburg Aff. ¶ 9; Altenburg Aff., Ex A.).

Most significantly, Farzan himself was granted an extension to December 2011, arranged through communications between Farzan and Gen10 staff in March 2011.  (Farzan Tr.: 129:3-23).  Had he stayed on at Wells Fargo through that end date, Farzan would have completed a 23-month assignment.  By the time of his termination in November 2011, he had already completed 22 months.  Farzan cannot raise an inference of discrimination, or even show that he was treated differently pursuant to the NYCHRL standard, by arguing that Wells Fargo failed to extend his assignment because Wells Fargo had already done so, allowing him to stay on for a stint that went beyond Wells Fargo's normal cap.  (Farzan Tr.: 129:3-23).  Nor can he show that he was treated less well than those outside his protected class when he, like Palem, Judd, and Abraham (assuming again that they do not in fact share Farzan's protected characteristics), was singled out to benefit from an extension.

While Farzan may be aggrieved that he did not receive further extensions for tenures as long as Judd's and Palem's, Wells Fargo has proffered a facially legitimate reason for how it set assignment lengths and extensions: utilizing contingent workers in different roles for varying terms based on changing business requirements.  Farzan counters that "Altenburg has created

44

concepts such as 'stint' and 'business need' just to get away with discrimination.  It does not

make business sense to force a qualified employee to leave his job and transfer his projects to

new employees." (Farzan Mem. at 13).  Yet Farzan's assertion that the contingent worker policy

is a pretext for discrimination is not supported by any part of the record.  In any case, although

Farzan may well have understandable frustrations with the policy, his concerns about its

soundness are beside the point.  Without *some* basis for a reasonable juror to believe that the

proffered rationale is pretextual, the court "may not second-guess an employer's non-

discriminatory business decisions, regardless of their wisdom."  Williams v. NYC Dep't of

Sanitation, No. 00 Civ. 7371 (AJP), 2001 WL 1154627, at *18 (S.D.N.Y. Sept. 28, 2001); see

also Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) (court's role is

"not to act as a 'super personnel department' that second guesses employers' business

judgments"); Scaria v. Rubin, No. 94 Civ. 3333 (AJP), 1996 WL 389250 at *8 (S.D.N.Y. July

11, 1996) ("an employer has discretion even to make a bad business decision . . . , so long as that

decision is not motivated by discrimination"), aff'd, 117 F.3d 652 (2d Cir. 1997).

Consequently, Farzan has not met his burden of establishing a prima facie case and

Defendants are entitled to summary judgment on all discrimination claims arising from Wells

Fargo's refusal to extend his employment.

## C.  Retaliation Claims

### 1.  Applicable Standards

#### a.  Title VII, the ADEA, and the NYSHRL

The anti-retaliation provisions of Title VII and the ADEA are similarly worded,

prohibiting employers from discriminating against any individual because he opposed any

practice made unlawful by the statutes, or because he made a charge, testified, assisted, or

otherwise participated in an investigation or agency proceeding. See 42 U.S.C. § 2000e-3; 29

U.S.C. § 623.  Under the NYSHRL, it is similarly unlawful for employers to "discriminate

against any person because he or she has opposed any practices forbidden [by the NYSHRL]

. . . or because he or she has filed a complaint, testified or assisted in any proceeding." N.Y.

Exec. Law § 296(e) (McKinney).  Retaliation claims under these three statutes, like direct

discrimination claims, are uniformly analyzed under the McDonnell Douglas burden-shifting

framework.  See, e.g., Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010)

(commonality of Title VII and ADEA analysis); McMenemy v. City of Rochester, 241 F.3d 279,

283 n.1 (2d Cir. 2001) (commonality of Title VII and NYSHRL analysis).

    As part of his burden of establishing a prima facie case, the plaintiff must adduce

evidence showing: "(1) participation in a protected activity; (2) that the defendant knew of the

protected activity; (3) an adverse employment action; and (4) a causal connection between the

protected activity and the adverse employment action." Hicks v. Baines, 593 F.3d 159, 164 (2d

Cir. 2010) (quotation omitted).  With respect to the first element, the plaintiff need not establish

that the employer's conduct being opposed was in fact prohibited discrimination, "but only that

[the plaintiff] possessed a good faith, reasonable belief that the underlying employment practice

was unlawful [under the relevant statutes]." Summa v. Hofstra Univ., 708 F.3d 115, 126 (2d Cir.

2013) (quotation omitted).  "The reasonableness of the plaintiff's belief is to be assessed in light

of the totality of the circumstances." Kelly v. Howard I. Shapiro & Associates Consulting

Engineers, P.C., 716 F.3d 10, 14-15 (2d Cir. 2013) (quotation omitted).  As to the second

element, "implicit in the requirement that the employer have been aware of the protected activity

is the requirement that it understood, or could reasonably have understood, that the plaintiff's

opposition was directed at conduct prohibited by [the applicable statutes]." Galdieri-Ambrosini

v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998). And as to the third and fourth

elements, the adverse employment action must be material, "harmful to the point that [it] could

well dissuade a reasonable worker from making or supporting a charge of discrimination."

Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 58 (2006).

Ultimately, "the plaintiff's burden [in establishing a prima facie case of retaliation] is de

minimis, and the court's role in evaluating a summary judgment request is to determine only

whether proffered admissible evidence would be sufficient to permit a rational finder of fact to

infer a retaliatory motive." Hicks, 593 F.3d at 164 (quotation omitted). Provided the plaintiff

succeeds in this regard, a presumption of retaliation is created and the employer must "articulate

a legitimate, non-retaliatory reason for the adverse employment action." Id. at 164. If the

employer is also successful, the burden once again shifts to the plaintiff to establish that

retaliation was a "substantial reason" behind the adverse action by showing that "a retaliatory

motive played a part in the adverse employment actions even if it was not the sole cause." Id.

### b. The NYCHRL

Under the NYCHRL, an employer may not "retaliate or discriminate in any manner

against any person because such person has . . . opposed any practice forbidden under [the

statute]." N.Y.C. Admin. Code § 8–107(7). While post-Restoration Act retaliation case law is

still developing, the framework for assessing retaliation claims under the NYCHRL generally

echoes the approach under federal and state law, although applying a "slightly different

standard." Delville v. Firmenich Inc., 920 F. Supp. 2d 446, 463 n.13 (S.D.N.Y. 2013). To

establish a prima facie case, the plaintiff must show that: "(1) he participated in a protected

activity known to the defendant; (2) the defendant took an employment action that disadvantaged

the plaintiff; and (3) that a causal connection exists between the protected activity and the

alleged adverse employment action." Fattoruso v. Hilton Grand Vacations Co., LLC, 873 F.

Supp. 2d 569, 580 (S.D.N.Y. 2012), aff'd, 525 F. App'x 26 (2d Cir. 2013) (citing Farrugia v. N.

Shore Univ. Hosp., 820 N.Y.S.2d 718, 727 (Sup. Ct. 2006)).

     Consistent with the liberal standards of the NYCHRL, "the retaliation inquiry under the

[city law] is broader than its federal counterpart." Fincher v. Depository Trust & Clearing Corp.,

604 F.3d 712, 723 (2d Cir. 2010) (quotation marks omitted). The concept of protected activity

"can include situations where a person, before the retaliatory conduct occurred, merely made

clear her disapproval of [the defendant's] discrimination by communicating to [him], in

substance, that she thought [his] treatment of [the victim] was wrong." Mihalik, 715 F.3d at 112

(quoting Albunio v. City of New York, 16 N.Y. 3d 472, 479 (2011)) (internal quotation marks

omitted). Additionally, the employer's action in response to the activity need not constitute a

"materially adverse change in the terms and conditions of employment . . . , provided, however,

that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter

a person from engaging in protected activity." Restoration Act § 3, N.Y.C. Local L. No. 85

(amending N.Y.C. Admin. Code § 8–107(7)).

### 2.  Because Farzan Did Not Engage in Protected Activity, He Cannot Establish a Prima Facie Case of Unlawful Retaliation

     Farzan contends that he suffered unlawful retaliation because his termination was

causally related to one or more of the following: his conversation with Chan in September 2011,

in which he informed Chan that he would take legal action if he were not converted to

permanent employee status and if his job tenure was not extended (Am. Compl. ¶ 30); his

communications with Wells Fargo and Gen10 management in October 2011 in which he asserted

that he was legally a Wells Fargo employee (Am. Compl. ¶ 61); and his filing of EEOC charges

(Am. Compl. ¶ 63). None of these instances constitutes protected activity that can underpin a

prima facie case of retaliatory discharge under Title VII, the ADEA, the NYSHRL or the NYCHRL.

First, even assuming that Farzan had a good faith belief that he was protesting unlawful discrimination when he made his threat of legal action to Chan and asserted his employee status to Wells Fargo and Gen10 management, this belief was not reasonable based on the totality of the circumstances. As discussed in the analysis of the underlying discrimination claims, Farzan adduces no evidence to suggest that his membership in a protected group played any role in Wells Fargo's failure to convert him to permanent status or extend his assignment. Instead, the evidence shows that Farzan never submitted applications to the positions for which he claims he was rejected, and was if anything treated preferentially in being granted an earlier job extension. Where a plaintiff "presents no other evidence to establish an objective basis for [his] claims, [his] threat to file a discrimination claim [is] unreasonable as a matter of law" and consequently, "[t]he threat [is] not a protected activity, and [his] retaliation claim must be dismissed." Sackey v. City of New York, No. 04 Civ. 2775 (WHP), 2006 WL 337355, at *10 (S.D.N.Y. Feb. 15, 2006), aff'd, 293 F. App'x 89 (2d Cir. 2008); see also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (retaliation claim fails because incident underlying complaint cannot reasonably amount to Title VII violation); Galdieri-Ambrosini, 136 F.3d at 292 (gender discrimination plaintiff's belief that retaliation occurred unreasonable where "there was no semblance of gender-oriented motivation" in her complaint about undesirable work assignments).

Relatedly, no reasonable juror could conclude from the record that Wells Fargo knew, or reasonably could have known, that Farzan's complaints constituted opposition to conduct prohibited by discrimination laws. While Farzan did tell Chan that he would file a

"discrimination complaint" when told he would not be kept on at Wells Fargo, even in his own account of the conversation, he said nothing beyond this one remark that in context could be "understood to have been about race" or other protected classifications. Lee v. Sony BMG Music Entm't, Inc., No. 07 Civ. 6733 (CM), 2010 WL 743948 at *11 (S.D.N.Y. Mar. 3, 2010). "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment *due to his membership in a protected class* and that he is not complaining merely of unfair treatment generally." Aspilaire v. Wyeth Pharm., Inc., 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009) (emphasis added); see also Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 363 (S.D.N.Y. 2012) ("[w]hile no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition") (quotation omitted).

Throughout his communications with Wells Fargo and Gen10 management in October 2011, Farzan's sole contention was that he believed that the contingent worker policy did not apply to him as he was Wells Fargo's direct employee under the legal definition of the term. Because a failure to classify a worker as permanent is not, in itself, conduct prohibited by Title VII and related laws, Defendants could not have been put on notice that Farzan was alleging negative treatment based on discrimination. Indeed, as in his conversation with Chan, Farzan did not allude once to race, gender, national origin, religion or any other protected characteristic as playing a role in Wells Fargo's decisions at this time. See Panzarino v. Deloitte & Touche LLP, No. 05 Civ. 8502 (BSJ), 2009 WL 3539685, at *11 (S.D.N.Y. Oct. 29, 2009) (plaintiff's complaint that a supervisor had contradicted internal company ethical principles was not protected activity as it could not have alerted employer that she was opposing violation of Title VII); Neishlos v. City of New York, No. 00 Civ. 914 (SAS), 2003 WL 22480043, at *8 (S.D.N.Y. Nov. 3, 2003) (employer could not have known about claim of religious and ethnic

discrimination where plaintiff's complaint was limited to assertion that his performance evaluation had been falsified); Marks v. Nat'l Commc'ns Ass'n, Inc., 72 F. Supp. 2d 322, 337 (S.D.N.Y. 1999) (plaintiff who protested to employer that failure to promote her despite her qualifications was unfair but never suggested gender-bias as motivation did not engage in protected activity).

The NYCHRL, even with its more liberal standard, still demands reasonableness to substantiate retaliation claims. After all, the anti-retaliation provision of the city law requires a plaintiff to oppose a practice made unlawful by the NYCHRL; that is, the plaintiff must "ma[ke] clear her disapproval of . . . *discrimination* by communicating to [the employer], in *substance* [the alleged illegal treatment]." Mihalik, 715 F.3d at 112 (emphasis added). Where no objective basis exists to substantiate allegations of unlawful behavior in the least, and as a consequence the employer is not reasonably informed of a charge of discrimination, there is no protected activity. See Fattoruso, 873 F. Supp. 2d at 581 (no reasonable basis for complaint where grievance concerned violation of company policy and not NYCHRL); Mayers v. Emigrant Bancorp, Inc., 796 F. Supp. 2d 434, 449 (S.D.N.Y. 2011) (complaint of general mistreatment insufficient to put employer on notice of opposition to unlawful discrimination under NYCHRL).

Finally, Farzan's commencement of EEOC complaints against Wells Fargo and Gen10 cannot form the basis of a retaliation claim for the simple reason that the employers received notice of the complaints *after* the decision to terminate Farzan was made and carried out. Farzan filed his charge against Wells Fargo on October 27, 2011. (Am. Compl., Ex. F). He was terminated on November 8, 2011 (Wells Fargo Stmt. ¶ 99), and while the exact date the decision was made to fire him is not clear, the record indicates that as early as November 1, Wells Fargo

51

and Gen10 management were exchanging emails discussing this action. (Phillips Aff., Ex. S: November 1 and 2, 2011 Tracy McDonald Emails).

Wells Fargo only received a notice of Farzan's charge from the EEOC on November 9, 2011, according to a time-stamped copy filed as part of Wells Fargo's motion papers. (Phillips Aff., Ex. U). Farzan's contention that Wells Fargo must have received the notice on November 7, based on the EEOC's policy to send such notices within ten days after a complaint is initiated, and then waited to time-stamp it until after he was fired, lacks any evidentiary support. See supra n. 10. Because a pro se plaintiff may not rely merely on a bald assertion that an opposing party falsified exhibits in order to create a material issue, Dixon v. Zenk, 361 F. App'x 218, 219 (2d Cir. 2010), a reasonable juror could only conclude that Farzan's EEOC charge against Wells Fargo could not have been causally related to his termination. Because Farzan's charge against Gen10 was filed on November 9, 2011, two days after his termination, it too cannot have been related to any retaliatory act by Gen10. (Am. Compl., Ex. J).

As Farzan has not established that he was engaged in protected activity and therefore has not met his burden of establishing a prima facie case of retaliatory discharge, Defendants are entitled to summary judgment on all retaliation claims.

### D. Defamation Claims

Read as broadly as possible, Farzan's amended complaint also raises state law allegations of defamation against individual defendant Altenburg. (Am. Compl. ¶ 70). Farzan claims that Altenburg's "slanders and libels that his performance deteriorated in the last few weeks" were repeated by Bernard in Wells Fargo's position statement to the EEOC, filed in response to Farzan's charge. (Id.). Summary judgment in favor of Altenburg is proper for the same reasons as the earlier dismissal of similar claims against two other individual defendants. See Farzan,

2013 WL 2641643, at *4.  Namely, pursuant to New York law, absolute immunity attaches to statements made in the course of a judicial or quasi-judicial proceeding.  See Silver v. Mohasco Corp., 476 N.Y.S.2d 822, 822 (1984); Long v. Marubeni Am. Corp., 406 F. Supp. 2d 285, 293–95 (S.D.N.Y. 2005). "This privilege applies to statements submitted to agencies such as the EEOC." Bernstein v. Seeman, 593 F. Supp. 2d 630, 636 (S.D.N.Y. 2009) (citations omitted).  Accordingly, leaving aside the issue of whether Altenburg can even be identified as the source of any of the content of Wells Fargo's EEOC position statement, Farzan's defamation claims against her must be dismissed as a matter of law.

### III.   CONCLUSION

For the foregoing reasons, I recommend that the motions for summary judgment by Wells Fargo, Altenburg, and Gen10 be granted and that the amended complaint be dismissed.

### PROCEDURE FOR FILING OBJECTIONS
### TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan and the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Sullivan.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596

F.3d 84, 92 (2d Cir. 2010).  If Farzan does not have access to cases cited herein that are reported

on Westlaw or Lexis, he should request copies from Defendants.  See Lebron v. Sanders, 557

F.3d 76, 79 (2d Cir. 2009).


Dated:  New York, New York
         December 2, 2013


JAMES L. COTT
United States Magistrate Judge


**A copy of this Report and Recommendation has been sent to:**

Raymond Farzan
P.O. Box 426
Middletown, NJ 07748